JULY 1829.

Roberts and Battle
v.
Henry.

---

## BRANNAN et al. v. OLIVER.

1. A purchase by an administrator at his own sale, by auction, is not void *per se:* But is *prima facie* valid, if no unfairness appears.
2. Nor will such a sale made in South Carolina be held void, though made without an order of Court; the laws of South Carolina not being produced, to shew that such order is necessary.

2s    47
128   214
128   215

DYONISIUS OLIVER, a minor, by his next friend and guardian *ad litem*, Gorge Bowie, filed his bill in equity in Monroe Circuit Court, in April, 1823, against Mary Ann Brannan, James D. Godbold, James Wade, and Edward Stedham.    To this bill Mrs Brannan, Wade and Sted ham, filed their answers.

By the bill, answers, exhibits and admissions of the parties, it appeared, that *Seaborn Oliver*, the father of Dyonisius, the complainant, resided in South Carolina, and died there intestate in 1813, leaving some negroes and other property; that he was but little indebted; that Dyonisius was his only child, and that the widow Mary Ann, and he, were entitled to his estate; that the said Mary Ann was, in 1814, regularly appointed, in South Carolina, administratrix of said estate; that she gave security, and was duly qualified. After administration was granted, the widow, as it appears, sold the slaves in controversy and which belonged to said estate, at public auction; but without the order of the Court of ordinary, and bought them herself.  In 1817, she intermarried with James E. Brannan, who removed with her and the slaves to Monroe county Alabama.  Brannan died in Monroe county, leaving judgments against him unsatisfied; and the said Mary Ann, his widow, administered also on his estate, and thus became re-possessed of said negroes as

his administratrix; on those judgments in 1823, executions were issued, which were levied by the defendant Godbold, as sheriff, on the negroes; six in number. Four of the negroes were sold by the sheriff under those executions; Stedham bought three of them, and Wade one; for a fair price. The two others remained unsold in the hands of the sheriff, Godbold, who during the pendency of the suit, intermarried with Mrs Brannan, and they remained in their possession.

The complainant prayed that an account should be taken, and that two thirds of the residue of the estate should be paid him, being his proportion under the laws of South Carolina; and that the property should be decreed liable to satisfy his claim. It was admitted that Wade and Stedham were fair and innocent purchasers, for a full consideration, without notice; and the cause was submitted to the Court below to decide, if the purchasers were entitled to the property, or if it was liable to satisfy the complainant's demand.

At March term 1827, a final decree was rendered by the Chief Justice, establishing the distributive share of the complainant at $1609 64, and to satisfy the same, ordering the two slaves remaining unsold, valued at $800, to be delivered up; and that Wade should pay $337 35, and Stedham $472 29 their respective proportions, to the complainant, or that they should surrender the slaves; and that the defendants pay their respective shares of costs.

The defendants below, here assigned for error, a variety of matters in the proceedings there had, which are not noticed; as the points decided are fully stated in the opinion delivered in this Court.

BAGBY and LYON, and PARSONS and COOPER, for the appellants.

HITCHCOCK, for the appellee.

By JUDGE COLLIER. This cause presents for the decision of the Court the following questions: 1st. Can an administratrix become a purchaser at a sale, made by herself, of her intestate's estate? 2d. Will a sale made by an administratrix of her intestate's estate, in another state, without an order of Court, be considered regular, when it does not appear what is the law of that State?

An administrator is considered as a trustee for the benefit

of the creditors and distributees of his intestate's estate; and, upon that hypothesis, I proceed to consider this case. The weight of English authority is against the right of the trustee to purchase the estate of his *cestui que trust*, and is predicated upon reasoning, the force of which must impress itself upon every mind. To permit a trustee to purchase, while he is enjoying the confidence of his *cestui que trust*, it is said, would be to license him to speculate, by abusing his situation. His duty obliges him to communicate all information, and to exert all the care and industry necessary to dispose of the estate as advantageously, for his *cestui que trust*, as if he were selling it for himself. His interest would sometimes thwart his duty, and the infirmity of human testimony would render it impracticable at all times, to prove its violation; hence the policy of the rule which divests him of a legal capability to purchase. In its correctness, when not carried to too great an extent, I most cordially acquiesce. I admit its wisdom, when applied to a purchase by an agent, at a sale by himself, of his prinpal's property, and to other purchasers under the same circumstances; but I must repudiate its application in the case I am considering.

The rule, with reference to a purchase by an administrator, has been frequently considered, both in the English and American Courts. By the former, it has been held to apply in all its strictness. The case of *Fox and Mackreth*, noticed in 2 Brown's Chancery Cases,[a] which seems to have engaged a full portion of the time of the Court of Chancery and the House of Lords, goes the entire length. The case of *Crow and Bullard*,[b] the cases in 5 Ves. jr.[c] and 6 Ves. jr.,[d] are to the same point. It is worthy of remark, that in only one of these cases, was the sale at auction.

The reasoning on which the rule is founded, inclines my mind to the opinion, that it does not extend to a purchase by an administrator, at a sale made by himself, of his intestate's estate; or, that if it extends to such purchase, it cannot be considered as applying, where the sale was made fairly. Let the case be examined by an application of this criterion to the facts on the record. Mary Ann Brannan, one of the appellants, and the mother of the appellee, administered on the estate of her husband, the father of the appellee, in South Carolina, where he died and before his death resided; and after the grant of the letters of administration, she sold the negroes mentioned in the appellee's bill, at public auction, without an order of the

7

JULY 1829.

Brannan et al.
v.
Oliver.

a Page 400.

b 3 Brown's Ch. Cases, p. 117.
c Campbell v. Walker page 678. Ex parte Reynolds 707
d Ex parte Hughes 617. Lister v. Lister, p. 631.

JULY 1829.

Brannan et al.
v.
Oliver.

Court of ordinary, purchased them herself, for any thing appearing to the contrary, at a full price, and made a return of the sale to the proper Court.

These facts develope no unfairness in the purchase by the appellant, Mary Ann. The idea of unfairness is repelled, by the circumstance that the sale was not made privately, but openly, where all persons who wished had an opportunity of bidding. There is no allegation in the bill that the slaves were sold at an under price, and there is no proof that such was the fact. It is not alleged that the slaves were not sold pursuant to the laws of South Carolina; nor is there any thing on the record, from which such a conclusion can be legitimately deduced. If the laws of that State do not tolerate a sale made in the manner this was, it should have been shewn by proof, what formalities the law required there to make it legitimate. In the absence of proof upon this point, the Court can only look to the common law to aid it in its determination, and suppose that it has been adopted in South Carolina as the governing rule on this topic. What says that system of jurisprudence? That an administrator may sell, or otherwise dispose of his intestate's personal estate, accountable however, for a correct discharge of his duty in this particular, and for an honest application of the proceeds. This sale may be made privately without a license from Court. The law under which he receives his appointment confers the license, and makes him answerable for its abuse.[a] Had the appellant have designed to defraud the appellee, and by that means derive a benefit to herself by a purchase of the slaves of her intestate, would she not, under the circumstances, have acted differently? It cannot be true that she would have exposed the slaves for sale publicly at auction; or if she had, she would never have returned to the Court an account of the sale. Had she intended to act dishonestly, and disregarded that moral duty she owed to the creditors and distributees of her intestate's estate, as well as to her securities for a correct administration of the estate, it would not have been difficult to have acted otherwise. It is beyond the power of the human mind to fathom her intentions; but be they what they may, there is nothing in the record which manifests an unfairness of fact or intention; and it would be against a settled and charitable rule of law gratuitously to presume it.

Let us examine the reasoning of the rule which maintains the invalidity of a purchase by an agent or trustee, with a view to ascertain if it embraces the case we are consider-

[a] Toller's Ex-ec'rs 133 240.

JULY 1829.

Brannan et al.
v.
Oliver.

ing. The great difficulty of discovering a disregard of the rights and interest of the *cestui que trust*, induced the determination of the Courts, that the trustee had no right to purchase, so long as his vicarial character continued. There, the only means, in almost every instance, to ascertain unfairness in the sale, was by such communication as the trustee might think proper to make; and it is unreasonable to suppose that he would make any disclosure, which would operate adversely to his interest; even when called on in equity, to answer on oath, if he was convinced that a knowledge of the facts was inclosed within his own bosom. How widely dissimilar is the case made out by the facts here? The administratrix sells at public auction the property of her intestate, where all who wish to purchase, have an opportunity of doing so; she returns an account of the sale to the Court, from which she receives her authority, and it is there recorded.   If there was any unfairness in such a sale, the testimony of those who were present, (and some persons must be, or the sale cannot be public,) and the records of the Court, would, I may venture to say, in fortynine fiftieths of the cases, disclose it; without depending alone upon the answer of the purchaser, in equity. Hence, I conclude, from the publicity of the transaction, that the rule when extended to a case like the present, is not sustained by just notions of policy; and that an administrator may purchase at a sale made at public auction, under legal authority, of his intestate's estate.

The authority furnished by the English and many of the American decisions, in favor of an extended application of the rule, cannot be received as conclusive or pertinent, in those states where administrators dispose of their intestate's estates by a public sale authorized by a special license from a Court of record, or where they make a return of such sale to the Court.   These decisions are predicated upon a different state of fact.   There the grant of administration is a license to them to perform whatever pertains to them in the character of administrator, and dispenses with a special authority.   There the sale is good, though made privately; consequently, sales made by administrators under such circumstances, are less public, and the probability of detecting a fraud greatly diminished.

I understand the rule to be founded upon the idea, that the purchase is a fraud in law upon the rights of those interested in the estate. · I consider it as most congenial with the condition of society and the character of human deal-

JULY 1829.

Branson et al.
v
Oliver.

ings, to narrow the catalogue of legal frauds to as few as practicable, and to declare no act as fraudulent *per se,* where a wise and just policy does not imperiously demand it. Every lawyer who is not too much enamoured with his early notions of law, will admit that the benefits which result from an extension of the doctrine of constructive frauds bears no comparison with the injury it inflicts. I introduce this view, merely to shew, that the rule should not be held to extend to all cases of trust.

I will now notice some authority in favor of the right of the administrator to purchase. In *Lindsay v. Lindsay, administrator,*[a] the Court of Chancery in South Carolina determined in favor of the sale and purchase by the administrator. Another case in the same book, is to the same point.[b] In *M'Guire and wife, and others, v. M'Gowen and wife, administratrix,* the same Court seem to treat the subject as if it was still an open question. Two of the Judges were in favor of the general authority to purchase; one of them, though he did not concur in the general authority of the administrator to purchase, held, that the trust being coupled with an interest in the particular case, he might be permitted to purchase; the other two Judges maintained the broad principle of incapacity. In *Perry and wife v. Dixon,*[d] the Judges seem to have been divided, as they were in the case of *M'Guire and wife, and others, v. M'Gowan and wife, administratrix.* The inference deducible from these decisions is, that an administrator, where he has an interest in the estate, may purchase; but where he has a mere naked trust, he cannot. The case we are considering comes within the rule as thus modified. The appellant, as the relict of her deceased husband, was entitled to one third of her husband's estate, and the appellee as sole heir and distributee, to the remaining two thirds. Without bending the strict rule further than it has been made to yield in the cases in 4 Dessaussure, it was competent for the appellant to have purchased.

In *Anderson and Starke v. Fox and others,*[e] the question as to the right of an executor to purchase property exposed to sale by himself, was discussed. Judge Tucker in the opinion which he delivered, remarked, that he was no means prepared to say that as to such purchase the executor was a *mere trustee.* "If this Court," said he, "were to declare the law to be such in all cases, even where there was an undoubted deficiency of assets, and although the sale should have been made after due notice at public,

a 1 Dess. 150.

b Brayton's Errs. Drayton et al. 567.
c 4 Dess. 487.

d Ib. 504 note.

e 2 Hen. and Muni. 245.

.duction, and with all possible fairness, it would probably be the immediate parent of a thousand suits in chancery, to set aside such purchases, either in behalf of the legatees, distributees or creditors." Again; "The practice has been too general in this country, and has prevailed too long, to be drawn in question by analogy to the doctrines in *England* concerning trustees of lands or commissioners of bankrupts. For though executors and administrators are, to many purposes, considered as trustees in a Court of equity, they are not so in all cases."[a] Judge Roane deemed it unessential to a decision of the case to express an opinion upon the question; rather intimating however, that the English decisions did not consist with the usage and understanding which prevailed in Virginia upon the subject. The opinion of Judge Tucker, has ever since been considered as correctly ascertaining the law in Virginia.

The remark of Judge Tucker, as to the generality of the practice of executors and administrators in Virginia, purchasing at sales of the estates they represented, will apply with equal force to this country; and the injury consequent upon a decision in opposition to usage, would be alike incalculable. Under these circumstances, nothing but rules of law too inflexible to yield to considerations of general convenience, should superinduce such a determination. Where rights have matured under a general impression that they were sustained by law, such impression should not be lightly regarded. And in cases where the adjustment of the law is more important than in what way it be settled, it should receive a controlling influence.[b]

In 2 Carolina Law Repository[c] the general authority is maintained, with this restriction, that the personal representative shall be answerable to the creditors to the full value of the property. And in 2 Haywood,[d] it is held that an executor may purchase the property of his testator at a public sale by order of Court.

Having shewn that there is little danger of unfairness in the sale passing undetected where it is made publicly, I proceed to consider whether a just policy does not require a relaxation of the rule in such cases. It is certainly for the interest of the creditors and distributees, that the estate should yield, when sold, as large a sum as practicable; and as the surest means to effect that result, a fair and honorable competition should not only be tolerated, but encouraged. The widow or some near relative is most frequently the personal representative, and most solicitous to purchase

*Margin notes:*

JULY 1829.

Brannan et al.
v.
Oliver.

[a] 2 Vesey. 482.

[b] Jones v. Logwood.
1 Wash. 42.
Colhoun v. Snider.
6 Bin. 153.
Waters et al. v. Stewart.
N. Y. Cases in Error 47,
[c] Page 49.

[d] Tomlinson's Exrs. v. Destestitatins Exrs. p. 284.

some particular portion of the intestate's estate; and if not permitted to purchase by openly bidding, would procure some one to become the ostensible purchaser, and acquire through him the ownership.   If this can be done, and it is beyond the operation of human laws to restrain it, without inhibiting, to an impolitic extent, the transfer of property, why declare that the administrator shall not be permitted to purchase?   The rule · when extended to such a case can produce no good; since by a kind of tacit understanding, which the law cannot reach, he can acquire title through another.   Surely, reason and good sense demand. that he should be permitted to do that, directly, which he can do indirectly; and when too, if there is unfairness in the sale, detection is almost inevitable.

This course of reasoning has brought my mind to the conclusion, first: that the purchase by the administratrix is *prima facie* valid, because divested of all unfairness; second: that the sale is *prima facie* legal, because it does not appear what the law of South Carolina is.   Without therefore expressing an opinion upon the other assignments of error, I am of opinion that the decree should be reversed, and the cause remanded, that an opportunity may be given to shew the law of South Carolina; and with me the Court concur.

* See the Cases of Gayle et al. v. Singleton.
1 Stewart p. 575.

Reversed and remanded *

The CHIEF JUSTICE and Judge CRENSHAW, not sitting.